UNITED STATES, Appellee

v.

LEO R. GREEN, Corporal, U. S. Army, Appellant

5 USCMA 610, 18 CMR 234

No. 5486

Decided April 15, 1955

Lt Col Edward Duvall, U. S. Army, Capt Albert C. Malone, Jr., U. S. Army, and 1st Lt David J. Conroy, U. S. Army, for Appellant.

Lt Col Thomas J. Newton, U. S. Army, Lt Col William R. Ward, U. S. Army, and 1st Lt Benjamin C. Flannagan, U. S. Army, for Appellee.

## Opinion of the Court

Paul W. Brosman, Judge:

The case before us requires that we consider a certain military-legal practice in the light of accepted standards of professional behavior. Following trial by a general court-martial under three specifications alleging larceny—in violation of Article 121 of the Uniform

Code of Military Justice, 50 USC § 715 —the accused, Green, was found guilty as charged, and sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances, and to be confined at hard labor for one year. The convening authority approved the findings and sentence, but reduced the confinement by one month. After a board of review in the office of The Judge Advocate General, United States Army, had affirmed, we granted review to determine whether a certain document—prepared by the lawyer who represented Green during the Article 32 investigation—was submitted to the trial counsel of the court-martial which tried him, in violation of obligations implicit in the attorney-client relationship.

## II

After the charges before us were referred appropriately to an officer for investigation pursuant to the requirements of Article 32 of the Uniform Code, 50 USC § 603, the accused was advised of his right to be represented by counsel during this preliminary proceeding. Being otherwise unrepresented, he requested that he be assigned the services of an attorney, but it appears that he expressed no sort of personnel preference. Thereafter Lieutenant Colonel Y, staff judge advocate of the accused's command, designated one of his assistants, a certain captain of The Judge Advocate General's Corps whom we shall call X, to serve in this capacity. At the conclusion of the pretrial investigation—which terminated in a recommendation that the accused be tried by general court-martial—this same captain prepared a memorandum of the testimony which would probably be offered against Green at his subsequent trial. This memorandum—the one with which we are concerned here—was submitted by X to Colonel Y, who, in his capacity as legal adviser to the officer exercising special court-martial jurisdiction over the accused, had directed the former to prepare it. Eventually, the charges, together with the challenged memorandum, were forwarded to the Commander-in-chief, United States Army,

Europe, who convened the court which later convicted the accused.

Although the paper prepared by Captain X was originally untitled, it appears that Colonel Y subsequently inked in the heading "Memo for trial counsel," and—for the information and assistance of prosecution personnel—noted on the document as well that a certain Sergeant Watts, one of the prospective Government witnesses referred to therein, would shortly be rotated to another area, and would thereafter be unavailable to testify. The memorandum, together with its notations, became a part of the allied papers to which the trial counsel had access in the preparation of his case against the accused. Undoubtedly, its contents were scrutinized by the prosecutor with care—for the document was certainly present in the Government's file, and moreover it was addressed to his particular attention.

In the paper under scrutiny Captain X purported to summarize the expected testimony of nine persons, whose signed statements were attached to the report of the Article 32 investigation. Although the document seems to contain no information which does not otherwise appear in inchoate form among investigation exhibits, in its several paragraphs the evidence essential to establish each specification, as well as a specific indication of its sources, is neatly outlined and organized. Captain X did not defend the accused at the trial—that duty having been assigned to a lieutenant named Z. This latter officer now concedes that he had, in fact, learned of the presence of the X document in the prosecutor's file prior to trial, but decided against raising the matter during the court-martial hearing. In a post-trial affidavit Z said: "While I realized the possibility that the attorney-client relationship had been violated I could not see that further delay would in any way alleviate the damage which would have already occurred if that had been the case."

## III

"This [attorney-client] privilege—

one of the oldest and soundest known to the common law—exists for the purpose of providing a client with assurances that he may disclose all relevant facts to his attorney safe from fear that his confidences will return to haunt him." United States v. Marrelli, 4 USCMA 276, 15 CMR 276. Under the modern view, the privilege exists for the protection of the client—not the attorney—in enabling the former to communicate to his counsel information necessary for professional representation; and in general—and for obvious reasons—doubts must be resolved in favor of the inclusion of a doubtful communication within its folds. A lawyer is duty-bound not to divulge a client's confidences to the disadvantage of the latter. Canon 37, Canons of Professional Ethics of the American Bar Association. Although this proscription is applicable to representation in both civil and criminal matters, its place is particularly sure in the latter field, where conceivably a disloyal or irresponsible act by a defense attorney may, in one way or another, operate firmly to close the door of the penitentiary on his client, or even to forfeit his life.

In the service of an accused person, therefore, a lawyer is protected against any sort of compulsion to disclose during the course of legal proceedings and, in addition, is forbidden to reveal elsewhere, and for virtually any reason, the former's confidential communications. But the obligations of such an attorney extend even further. Indeed, and apart from categorical divulgence of any nature—formal or informal, compelled or voluntary, conscious or unconscious—it is not permitted that he assist in the prosecution of one whom he represents, or has represented professionally in the same or a related matter at any prior time. This valid notion was expressed in the following terms by the court in In re Boone, 83 Fed 944, 952 (ND Cal):

"It is the general and well-settled rule that an attorney who has acted as such for one side cannot render services professionally in the same case to the other side, nor, in any event, whether it be in the same case or not, can he assume a position hostile to his client, and one inimical to the very interests he was engaged to protect; and it makes no difference, in this respect, whether the relation itself has been terminated, for the obligation of fidelity and loyalty still continues. . . . The test of inconsistency is not whether the attorney has ever appeared for the party against whom he now proposes to appear, but it is whether his accepting the new retainer will require him, in forwarding the interests of his new client, to do anything which will injuriously affect his former client in any matter in which he formerly represented him, and also whether he will be called upon, in his new relation, to use against his former client any knowledge or information acquired through their former connection. . . . This general and well-settled rule is not found in any positive enactment. Indeed, none is necessary; it springs from the very nature and necessities of the relation of attorney and client, and finds its highest sanction in the confidential character of that relation. No rule in the ethics of the legal profession is better established nor more rigorously enforced than this one." [Emphasis supplied.]

And further language of interest in the present connection is found in the following excerpts from the opinion in People v. Gerold, 265 Ill 448, 107 NE 165, 177:

". . . The rule has long been firmly established that an attorney cannot represent conflicting interests or undertake to discharge inconsistent duties. When he has once been retained and received the confidence of a client, he cannot enter the service of those whose interests are adverse to that of his client or take employment in matters so closely related to those of his client or former client as in effect to be a part thereof. Weeks on Attorneys (2d Ed.) §§ 120, 271; 1 Thornton on Attorneys, § 174. This rule is a rigid one, designed not alone to prevent the dishonest prac-

titioner from fraudulent conduct, *but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties.* He should undertake no adverse employment, no matter how honest may be his motives and intentions. . . . It is the glory of the legal profession that its fidelity to its clients can be depended upon; that a man may safely go to a lawyer and converse with him upon his rights in litigation with absolute assurance that that lawyer's tongue is tied from ever discussing it. United States v. Costen (C.C.) 38 Fed 24. This rule has been so strictly enforced that it has been held that an attorney, on terminating his employment, cannot thereafter act as counsel against his client in the same general matter, *even though while acting for his former client he acquired no knowledge which could operate to the client's disadvantage in the subsequent adverse employment.* . . . The canons of ethics of the American Bar Association and various state associations in this country are in accord on this subject with the rule just stated. *An attorney cannot be permitted to assist in the prosecution of a criminal case if by reason of his professional relations with the accused he has acquired a knowledge of the facts upon which the prosecution is predicated or which are closely interwoven therewith.* Wilson v. State, 16 Ind. 392; Commonwealth v. Gibbs, 4 Gray (Mass.) 146. The members of the profession must have the fullest confidence of their clients. If it may be abused, the profession will suffer by the loss of the confidence of the people. The good of the profession, as well as the safety of clients, demands the recognition and enforcement of these rules. . . . The administration of the law should be free from all temptation and suspicion, so far as human agencies are capable of accomplishing that object, and public policy strongly demands that one who has been employed on one side should not be permitted to appear on the other side. *It is not sufficient to say that the law will not permit him to disclose any fact which may have been communicated to him."* [Emphasis supplied.]

A sampling of other authorities pointing in the same direction is set out hereafter. 5 Am Jur, Attorneys at Law, § 66; Canons 6 and 37, Canons of Professional Ethics of the American Bar Association; Fitzsimmons v. State, 116 Neb 440, 218 NW 83; T. C. & Theatre Corp. v. Warner Bros. Pictures, 113 F Supp 265 (SD NY); State v. Rocker, 130 Iowa 239, 106 NW 645; Pierce v. Palmer, 31 RI 432, 77 Atl 201; Parker v. Parker, 99 Ala 239, 13 So 520; Strong v. International Building, Loan & Inv. Union, 183 Ill 97, 55 NE 675; Hosford v. Eno, 41 S Dak 65, 168 NW 764; Anderson v. Eaton, 211 Cal 113, 293 Pac 788; Steeley v. State, 17 Okla Cr 252, 187 Pac 821. Proper analysis, as much as a reading of the civilian cases, convinces us that a lawyer, who has on any previous occasion represented an accused person, must avoid the slightest suspicion, the very appearance, of assisting—little or much, directly or indirectly, consciously or unconsciously—in the prosecution of his erstwhile client, from whom he may have acquired private information. In short—to quote the picturesque language of the North Carolina Supreme Court—"The unamendable mandate of both law and morals forbids an attorney, in the homely phrase of the fields, 'to run with the rabbits and bark with the hounds,'" Gilliam v. Saunders, 204 NC 206, 167 SE 799.

No more does military law tolerate disloyalty on the part of an accused's lawyer. The Uniform Code of Military Justice, Article 27 (a), 50 USC § 591, provides that "No person who has acted for the prosecution shall act subsequently in the same case for the defense, nor shall any person who has acted for the defense act subsequently in the same case for the prosecution." See also Manual for Courts-Martial, United States, 1951, paragraph 87c. And a service board of review has commented appropriately in a recent case:

"The termination of the attorney-client relationship does not terminate

the attorney's obligation to the client to preserve the privilege implicit in the confidential communications *and to abstain from taking any part in the proceedings contrary to the client's interest*. The privilege in pertinent respects might well be classed as eternal because it is, with certain exceptions not applicable here, not limited to the duration of the litigation. The right to require that counsel not take action adverse to the client is limited to the same or allied proceedings. Furthermore where in the same general proceedings an attorney takes a position opposed to his former client, *it is immaterial that he may not divulge confidential communications from that latter person.*" [United States v. Bryant, 16 CMR 747. Emphasis supplied.]

The sound principles laid down in the foregoing case have received support in numerous boards of review opinions. United States v. Alvaro-Rodriguez, 81 BR 359; United States v. Lloren, 80 BR 61; United States v. Mace [ACM 5329], 5 CMR 610; United States v. Jenkins, 4 CMR(AF) 160; United States v. Homan, 6 CMR 504.

This requirement of unswerving loyalty from the lawyer who represents a military accused person must be regarded as equally exacting whether he serves at the trial proper, or during the formal investigation—assimilable to a grand jury's proceedings—preliminary thereto. The Manual provides that *"Military . . . counsel detailed, assigned,* or otherwise engaged to defend or represent an accused before a court-martial or upon review of its proceedings *or during the course of an investigation of a charge,* are attorneys, and the accused is a client, with respect to the client and attorney privilege." Manual for Courts-Martial, supra, paragraph 151*b*(2). (Emphasis supplied.) And the circumstance that the lawyer's rule as counsellor had, as a practical matter, terminated prior to the rendition of his challenged assistance to the prosecution, in no wise insulates or purifies this later conduct. United States v. Bryant, supra.

## IV

Did the action of Captain X in the case at bar—directed by his official superior, Colonel Y—vio- ██ late the spirit of the principles developed in the preceding section of this opinion? In fairness, it is difficult to charge the Captain with conscious disloyalty to his former client. Certainly there is no express showing that he disclosed any confidential communication made to him by Green. It cannot be denied, however, that he *may* well have done so, for we have no conceivable means of knowing what he had been told—and the Canons of Ethics assure us that the presence of "other available sources of such information" does not in any manner serve to relieve him from the obligation of secrecy. See Canon 37, Canons of Professional Ethics of the American Bar Association. Thus, if there was overlapping between what the accused confided in the Captain, on the one hand, and information contained in the several statements of witnesses, on the other, he may not be excused by reason of his reliance on the latter, and the fact that, strictly speaking, he added nothing to that which was otherwise present in the prosecution file.

In further defense of X's motives, it may be said that there is little reason to doubt his post-trial assertion to the effect that he believed the memorandum he confected to have been intended for the sole use of Colonel Y— presumably in determining the latter's recommendation to higher authority with respect to action on the instant charges. Given the theory of military law that the staff judge advocate occupies no partisan position, there was probably slight basis for X to have supposed that the service of this particular purpose would, to any measurable extent, have redounded to his client's detriment. Further, since he appears to have contributed no specific information *not already* in the Government's possession, it is understandable that he may not have *pictured himself* as betraying a real interest of his client. Unfortunately, though, his conduct, together with that of Colonel Y—and however innocently both may have acted

**615**

—has served to create, at the very least, a distinct *appearance* of wrongdoing which we are required to deplore, and which we cannot avoid characterizing as error, that is, as amounting to substantially more than a mere procedural irregularity.

Not unnaturally, we have been met with a vigorous Government argument to the effect that the X memorandum contributed nothing—and could not possibly have added anything—to the later prosecution of the accused. Thus, it is suggested that, if the Captain had been an expert typist, and—at the request of Colonel Y—had prepared true copies of statements already in Government files, he would have rendered assistance no less mechanical than the aid he gave here. We are unwilling to treat the matter so lightly, and also quite unable to accept the proffered analogy. Captain X was a licensed attorney, and in addition a lawyer certified by The Judge Advocate General of the Army, and serving in a legal assignment in the office of his command's staff judge advocate. He defended the accused, Green, during the pretrial investigation of the latter's case. Thereafter he prepared a *professional* document in which he set out and organized carefully and competently a summary of the testimony—together with its several sources—which would, in his opinion, suffice to establish that his client had committed the crimes with which he was charged, the very ones against which he had been defended by the Captain at the pretrial level.

Certainly, the author of the challenged paper was better prepared than any other to perform this prosecution task promptly and efficiently—and it must be apparent that he had acquired this preparation through familiarity with evidence acquired while serving as the accused's lawyer. Certainly too, he performed no mechanical task; what he did he did as a *lawyer*. In constructing the memorandum under fire, he was performing what was clearly a professional chore—and one of obvious aid to the lawyer who subsequently presented the Government's case at Green's trial. Reference may be made at this point to the routine use of similar guidance memoranda to trial counsel in general court-martial cases within the command with which we are concerned here. See United States v. Haimson, 5 USCMA 208, 17 CMR 208; United States v. Blau, 5 USCMA 232, 17 CMR 232. We cannot suppose that this standing operating procedure would have been adopted had it not been regarded as of value to the prosecutor at a military trial.

Accordingly, we find in the questioned document a measure of aid—albeit indirect and possibly slight—to the Government, as well as more than a fair risk that Captain X, in fact, assisted in the prosecution of his recent client. It must be clear that doubts in such a case must of necessity be resolved against a practice which so manifestly skirts the proprieties—and the situation is unaltered by the virtual certainty that the dubious conduct was thoughtless and wholly innocent.

Since the rigid responsibility, imposed on attorneys is applied with full vigor in the military establishment, we experience no difficulty in condemning the *performance* of the two officers in the instant case—however much it may have been due to nothing more reprehensible than thoughtlessness. Captain X, and he alone, was responsible for the protection of the accused's rights at the pretrial investigation, and was, in effect, permanently enjoined from acting thereafter in a capacity adverse in any slightest degree to the interests of the accused—either directly or indirectly. See T. C. & Theatre Corp. v. Warner Bros. Pictures, supra.

As has been suggested earlier, affidavits submitted as exhibits to the Government's brief indicate that the Captain prepared the troublesome paper before us pursuant to orders from his superior officer and immediate supervisor, Colonel Y. We further observe from these affidavits that the latter was fully aware that the Captain had served as the accused's counsel during the pretrial investigation—for he had personally effected the assignment to that duty. Yet X was directed to prepare the memorandum—and proceeded to do so quite without protest,

616

and apparently without concern. We are at a distinct loss to comprehend the attitude of these two lawyers—and particularly that reflected in their explanatory affidavits.

Can it be that we have not made overt our disapproval of an older, and now outmoded, system of military criminal law administration under which, it has been said, the military prosecutor, the accused's attorney, the court-martial's "judge," together with the staff judge advocate—all happily employed under one roof, perhaps in a single room—not infrequently settled the fate of an accused person, in what was even then considered an adversary proceeding, amid the cozy comforts of an officers' mess. We have repeatedly emphasized the notion that, under the Uniform Code, the filing, investigation and referral of general court-martial charges are parts of no game; neither do they constitute steps in the paternalistic imposition of sanctions for the violation of club rules. Instead, these and related procedures constitute the elements of that which is a juristic event of substantial gravity—one demanding the very highest sort of professional responsibility and conduct from all attorneys involved.

We are, therefore, both disappointed and concerned to observe that neither Colonel Y nor Captain X seems greatly disturbed over the regrettable practice under which a defense lawyer was assigned—and performed—a task which flatly conflicted, if only in spirit, with his obligations to his accused client. Other legal officers must have been available for the purpose in the Colonel's mind. Certainly they should have been—if the temper of the Code is not to be thwarted. As we have frequently inquired in other and equally unfortunate settings, dare we hope that at some future time safer, sounder, and more seemly procedures will be adopted?

We have previously expressed displeasure at the practice by which legal officers are permitted to play dual roles in the same court-martial transaction. See United States v. Coulter, 3 USCMA 657, 14 CMR 75; United States v. Clis-son, 5 USCMA 277, 17 CMR 277; United States v. Crunk, 4 USCMA 290, 15 CMR 290. We deem the rationale of those decisions to be fully applicable to the present case—for if a military accused person is to rely on the professional responsibility and integrity of counsel, the confidence reposed in the latter must not be shattered by the fear that the confidant may be assigned subsequently to duties involving adversity to the interests of his onetime client. In commanding the application of a broad conception of the attorney-client privilege in military law, Chief Judge Quinn—speaking for a unanimous court in this point—used the following language in United States v. Fair, 2 USCMA 521, 10 CMR 19:

"We agree, with the board of review below, that there is even more reason in the military than in the civil sphere to encourage complete disclosure to his attorney by an individual in the armed forces accused of crime. There is a natural reluctance on the part of an enlisted man to supply details of possible wrongdoing to a superior officer. Without full knowledge of all the facts, an officer selected or appointed as counsel cannot adequately prepare a proper defense. *It is, therefore, our view that the rule,* [the attorney-client privilege] *grounded as it is in policy reasons even more sound in the military than in the civilian community, should be strictly enforced and not relaxed.*"

## V

From what has been said it must be evident that reversal is demanded. Undeniably there was error here—regardless of whether we measure in terms of appearances or of fact. But was there prejudice as well? We are sure that there was—whatever exactly this concept, this exercise in judicial psychology, may mean to any one of us. In the Berry case one of the members of this Court found "no difficulty in arriving at the conclusion that the accused was not accorded a fair trial, and that to . . . [him was] prejudice." See United States v. Berry, 1 USCMA

235, 2 CMR 141. If properly understood and applied, this approach will serve perfectly to bring the Court to a proper result in the case at bar. Cf. United States v. Woods, 2 USCMA 203, 8 CMR 3 (concurring opinion). However, a majority of us prefers to bottom the present action on the more selective notion of general prejudice.

In drafting the provisions of the Uniform Code relating to the appointment and duties of counsel, Congress strove to impress on the military establishment the necessity for the very highest standards of professional conduct on the part of legal officers of the Armed Forces. Implicit in those provisions, we are sure, is the duty of unswerving and undivided loyalty due from defense counsel to an accused person. Indeed the right to be represented by counsel—and of necessity by conscientious and scrupulous counsel—is paramount among the protections granted an accused by the Uniform Code. United States v. Clay, 1 USCMA 74, 1 CMR 74.

In our view—one compelled both by principle and prior citations of authority—this right to counsel is distinctly infringed by a practice which assigns to a defense lawyer the task of aiding the prosecution, however slightly and indirectly, in the preparation of a case against his client. There is more than a fair risk that this very result was achieved here by Captain X willingly and without protest, albeit innocently. Moreover, this questionable conduct was performed under orders—thoughtless ones no doubt—from his superior officer, the chief legal officer of a substantial command. We have no choice but to act to stem this chipping away at a vital—a structural—member of the military judicial edifice. Accordingly we must hold the actions of Captain X and Colonel Y here to have been generally and inherently prejudicial to the substantial rights of the accused. This result accords fully with the action of civilian courts in which violations of a lawyer's duty to a former client have

been found. Certainly in the overwhelming majority of cases they have been explicit in their willingness to dispense with a "search for prejudice." And this, of course, constitutes an invocation of what has been called within this Court the doctrine of general prejudice.

## VI

We are sure that no one will suppose that what has been said and implied earlier—or, indeed, that which is proposed hereafter—can be affected in any respect or degree by what must be regarded as the informed and considered omission of Lieutenant Z, who defended the accused at his trial, to raise the improper conduct of Captain X and Colonel Y for the consideration of the court-martial. Certainly, the right of a military accused person to the essentials of a fair trial cannot be waived by action on the part of his assigned counsel.

It follows that the board of review's decision must be reversed and a rehearing is ordered.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in the result):

I concur in the result.

I agree that error was committed when defending counsel failed to represent the accused with undivided fidelity, contrary to paragraph 48c of the Manual for Courts-Martial, United States, 1951. For the accused to have that right perverted by having his own counsel give aid to the prosecution is prejudicial and Article 59 (a) of the Code demands reversal. The author of the majority opinion anticipates accurately when he suggests that I am unwilling "to bottom the present action on the more selective notion of general prejudice." The documentation in his opinion indicates that many courts have disposed of the problem, and I suggest they never had to rely on any such conception. Nor should we.