UNITED STATES, Appellee

v.

Michael J. GODSHALK, Staff Sergeant
U.S. Air Force, Appellant.

No. 95–0878.
Crim. App. No. 30238.

U.S. Court of Appeals for
the Armed Forces.

Argued May 23, 1996.

Decided Sept. 18, 1996.

For Appellant: *Major Ormond R. Fodrea* (argued); *Colonel Jay L. Cohen* and *Captain Mark J. Simms* (on brief).

For Appellee: *Lieutenant Colonel Michael J. Breslin* (argued); *Colonel Jeffery T. Infelise* (on brief); *Colonel Thomas E. Schlegel.*

*Opinion of the Court*

CRAWFORD, Judge:

Pursuant to his pleas, appellant was convicted at Osan Air Base, Republic of Korea, of wrongful appropriation (3 specifications), assault with a dangerous weapon, and kidnapping, in violation of Articles 121, 128, and 134, Uniform Code of Military Justice, 10 USC §§ 921, 928, and 934, respectively. Appellant was sentenced to a dishonorable discharge, 5 years' confinement, partial forfeitures, and reduction to the lowest enlisted grade. Pursuant to a pretrial agreement, the convening authority disapproved the forfeitures and reduced the confinement to 40 months, but otherwise approved the sentence. The Court of Criminal Appeals affirmed the findings and the approved sentence in an unpublished opinion, 1995 WL 316275. We specified the following issue for review:

WHETHER APPELLANT'S PLEAS OF GUILTY WERE INDUCED OR DID HE

SUFFER ANY OTHER PREJUDICE AS A RESULT OF ANY VIOLATION OF HIS RIGHT TO COUNSEL. *See United States v. GREEN,* 5 USCMA 610, 18 CMR 234 (1955).

We hold that there was an express waiver of appellant's right to counsel. No evidence has been introduced of a disclosure of a confidential communication or prejudice to appellant.

## FACTS

Suffering from marital problems leading to a state of depression and suicidal tendencies, appellant, on January 11, 1992, was admitted to the emergency room of a nearby military hospital. About 3½ days later, he was released from the hospital with a diagnosis of a mixed personality disorder (not considered to be a mental disease) with a recommendation for administrative discharge. Upon learning of this recommendation, he obtained a pistol and went to Staff Sergeant Hughes' apartment, shortly after midnight on January 16, 1992. There he confronted Hughes with a loaded pistol because of Hughes' relationship with appellant's wife. He told Hughes that they were going for a walk. He had Hughes get into a government van; and, during a ride in the van, they had a long rambling conversation. After appellant released Hughes, he (Hughes) went to the quarters of a supervisor, Master Sergeant Hake, and told him what had happened. Hake called the squadron commander, who notified the Security Police. Appellant drove around aimlessly for about 2 days. During this time, he made numerous calls to Senior Master Sergeant Gulino, Chaplain Frick, and Captain (Capt) Carmen J. Battle.

Appellant testified that, on January 17, 1992, he called Capt Battle, the area defense counsel at the installation. Since she did not know anything about him, he told her to call Chaplain Frick or his commander.

Capt Battle talked to Chaplain Frick and learned that he had counseled appellant several times before and was aware of appellant's prior suicide attempts. When appellant called him on January 17 and said he was going to commit suicide, Chaplain Frick had this reaction:

I was absolutely convinced that if he said that's what he was going to do, it was not a bluff. He may, at some point, change his mind and decide not to, but the sense I had was that he was not playing with me because the plan was clear and he answered every question I had very, very specifically.

Later when appellant called Capt Battle again, he was surprised at all the information she had obtained.

During negotiations, it became clear appellant intended to commit suicide. What appellant needed was help but was afraid of sitting in jail. Chaplain Frick described the process as follows:

Well, that was a theme in our conversation over the phone on that Friday that I asked him, "Is there any circumstance under which you'd be willing to turn yourself in?" He said, "The only way I'll do that is that if I am assured that I'll be able to get the help I need. If I am just going to sit in a jail cell, I'd just as soon kill myself."

So as things evolved throughout that day, and then later the next day, that continued to be a very strong concern of his, and I had the feeling that there was a sincere effort being made on the part of the person who was doing most of the negotiating to comply with that request. Whether she could—

Q: Who was that person?

A: That was Captain Battle.

Q: Okay.

A: Whether she could actually make it happen or not, I think most of us were aware of the fact that she probably didn't have that within her power, but, clearly, since that was his primary concern, there was a sincere effort to try and meet that concern and respond in a way that would get him to come in.

All the individuals appellant called joined in an effort to convince him to abandon his plan to commit suicide and get him to return to the base.

Capt Battle did not appear as a witness at trial but a stipulation of expected testimony indicated that she "was first contacted by [appellant] on or about 16 January 1992 by telephone" and spoke to appellant on numerous occasions between January 16 and 18, 1992. During these conversations, appellant had asked if the conversations were confidential because she was his attorney. She replied yes. But she said in reality that they were not confidential because she had been "instructed" by her supervisor to report this information to the Office of Special Investigations and the Security Police. In extenuation and mitigation, appellant asserted that Capt Battle had assured him he would face a maximum punishment of 6 months' to one year's confinement, and the confinement would be only after he had received treatment. Based on these conversations, he surrendered on January 18, 1992.

At trial, there were no motions concerning Capt Battle's conduct. Civilian defense counsel, Mr. Dan R. Hyatt, argued that appellant surrendered himself based on Capt Battle's assurance. Upon inquiry by the judge, Mr. Hyatt stated that he was not arguing that appellant was denied counsel, but was contending that the Government should be held to the promises of proper mental health treatment held out by Capt Battle in her conversations with appellant. The following colloquy then ensued:

MJ: Well, but my point was that at least on the surface of it, there's a potential of your argument being perceived, one, as a counsel not being provided and two, I'm hearing conversations about confidentiality and I want to make sure that there's no claim by the defense that anything said by the accused to Captain Battle during the time period in question is something that's been used against him that you would feel you've got a motion—

CIV DC: [Mr. Hyatt]: We—

MJ: —for as well.

CIV DC: —expressly waived that, Your Honor, because we would have a potential Motion to Suppress. For instance the articles he surrendered at the time, and so forth. We expressly waived that on the record.

MJ: So, in other words, that's the concerns [sic] I have is, as least through what you're saying, there's some potential for those kinds of motions, and I appreciate making sure that I understand your position—

CIV DC: Yes, sir.

MJ: —concerning that.

CIV DC: Yes, sir.

MJ: So, then, I guess I'll, you know, proceed on that, but what you're saying is, as I understand it, that your client basically surrendered himself based on his understanding of what would happen after he returned to military control?

CIV DC: Yes, sir, and that the Government—if Captain Battle is actually an agent for the Government—and by her own testimony she is—and she made some promises to him and he relies on those to his detriment, I would ask the court to enforce those promises. I think that, as a matter of fairness, this court should give very heavy consideration to enforcing those promises.

\* \* \*

I would ask the court however—I think that an appropriate duration of confinement for Staff Sergeant Godshalk, under all of the circumstances, may be two or three years, but I think that in view of the fact that Captain Battle made these promises for [sic] him, I would ask the court to very carefully consider mitigating the punishment sufficiently to enforce that promise and to incarcerate this individual for not more than 12 months because that's what Captain Battle told him that he would receive.

MJ: And that gets me to the last question. I'm sorry to have such a—

CIV DC: Yes, sir.

MJ: —conversation in your argument, but again, I want to make sure, and I feel somewhat comfortable with that, as a Navy reservist, you're aware that the court has no power to require medical treatment or any other type of treatment.

CIV DC: Yes, sir. I am, and what I would ask the court to do—the only way that the court could truly, specifically require spe-

cific performance of this agreement would be basically to give the accused no punishment and leave the convening authority to provide him with mental health treatment.

I'm not going to ask the court to do that. I'm going to ask the court to give the accused the benefit of the doubt with respect to the duration of the confinement because he understood that he would probably serve some confinement, or possibly serve some confinement.

With respect to the mental health treatment, I would ask the court for a very strong recommendation to the convening authority that the confinement be abated pending a period of mental health treatment sufficiently that he could withstand that psychically [sic], and Dr. Greene testified that he felt six months in-patient treatment would provide this accused with the tools that he could endure this confinement and the balance of coming out of confinement and recognizing, by his own words, that maybe he's going to end up working at Burger King or something.

As to the "equities of this case," the Court of Criminal Appeals saw "no egregious, outrageous conduct by the Government which violates the Fifth Amendment or otherwise might give rise to an exercise of this Court's supervisory powers to dispel any overriding appearance that a miscarriage of justice occurred." Further, the Court held that "Capt B [Carmen J. Battle, accused's former counsel]'s interaction with appellant had no impact on his trial, his Sixth Amendment right to effective assistance of counsel, or his ability to prepare a defense as guaranteed by the Fifth Amendment." Unpub. op. at 11.

Moreover, even appellant testified that Capt Battle made promises regarding a possible sentence of 6 months to a year. Finally, Chaplain Frick testified that almost everything Capt Battle told appellant was carefully qualified.

Appellate defense counsel argue that there was a conflict of interest that may not be waived. *See United States v. Collier*, 20 USCMA 261, 43 CMR 101 (1971); *United States v. Green*, 5 USCMA 610, 618, 18 CMR 234, 242 (1955). Final Brief at 14.

The Government argues that appellant waived any issue concerning his right to counsel. Answer to Final Brief at 1. In any event, Capt Battle was seeking to help authorities to prevent appellant from committing suicide. "Divulging client confidences to prevent a client's suicide is within acceptable ethical standards of professional responsibility." *Id.*

## DISCUSSION

■■■ Under the circumstances of this case, absent plain error, failure to move to suppress evidence, dismiss the charges, or grant other appropriate relief constitutes waiver. RCM 905(e) and Mil.R.Evid. 103(d), Manual for Courts–Martial, United States (1995 ed.). To constitute plain error appellant must demonstrate the error was "plain," "clear," or "obvious," and affected a substantial right of appellant. *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993); *United States v. Fisher*, 21 MJ 327 (CMA 1986). This Court will not hesitate to correct any error if it "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. at 736, 113 S.Ct. at 1779; *United States v. Fisher*, 21 MJ at 328.

■■■ This is not a case of dual roles being performed by defense counsel or outrageous conduct by the Government. Both Congress (Article 27, UCMJ, 10 USC § 827) and this Court have gone to great pains to ensure to servicemembers the right to counsel. This right to a lawyer appointed free of charge, *see, e.g., United States v. Acton*, 38 MJ 330 (CMA 1993), applies at the pretrial stage, *see, e.g.,* Mil.R.Evid. 305(d)(1)(A), 305(e), 321(b)(2); trial stage, *see, e.g.,* Art. 27; post-trial stage and even the appellate stage, *see, e.g., United States v. Palenius*, 2 MJ 86 (CMA 1977). A concomitant right is the right to confidential communications between the attorney and client. Mil.R.Evid. 502. Any exception to this rule must ensure that there is no chilling effect on defendants freely speaking with their military lawyers. *See Grady v. Darley*, 44 MJ 48 (Summary disposition 1996). Thus, Mil.R.Evid. 502(a) pro-

vides for confidential communications "for the purpose of facilitating the rendition of professional legal services to the client."

Mil.R.Evid. 502(d)(1) provides for an exception to confidentiality of communications between an attorney and client:

*Crime or fraud.* If the communication clearly contemplated the future commission of a fraud or crime or if services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud[.]

This rule is reinforced by adoption of the ABA Model Rules of Professional Conduct by the Air Force.

ABA Model Rule of Professional Conduct 1.6 provides: .

(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).

(b) A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:

(1) to prevent the client from committing a criminal act that the lawyer believes is likely to result in imminent death or substantial bodily harm[.]

The Air Force Rule of Professional Conduct 1.6(b)(1) was modified to provide an exception to the rule of confidentiality as follows:

(1) ... to prevent the client from committing a criminal act that the lawyer believes is likely to result in imminent death or substantial bodily harm, or substantial impairment of national security or the readiness or capability of a military unit, vessel, aircraft or weapons system[.]

█ The ABA has issued an opinion providing that the rule of confidentiality does not attach to a "client's intention to commit suicide." ABA Committee on Ethics and Professional Responsibility, Informal Opinion No. 83–1500 (June 24, 1983). As with *Mi-*

*randa v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), there is a public-safety exception to privileged communications. *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). Clearly appellant told two individuals that he intended to kill himself. Thus, we hold that the imminent-death exception to the rule of confidentiality applies.

*United States v. Green,* 5 USCMA 610, 18 CMR 234 (1955), is clearly distinguishable. The defense counsel in *Green* worked in the Office of the Staff Judge Advocate and was legal adviser to Green's special court-martial convening authority. After the Article 32, UCMJ, 10 USC § 832, investigation, the SJA asked the defense counsel to prepare a memorandum to summarize the testimony "which would probably be offered against Green at his ... trial." Eventually this memorandum was made available by the SJA to the trial counsel for use in preparation of the prosecution's case. 5 USCMA at 612, 18 CMR at 236. As we said in *Green:*

"This [attorney-client] privilege—one of the oldest and soundest known to the common law—exists for the purpose of providing a client with assurances that he may disclose all relevant facts to his attorney safe from fear that his confidences will return to haunt him." *United States v. Marrelli,* 4 USCMA 276, 15 CMR 276. Under the modern view, the privilege exists for the protection of the client—not the attorney—in enabling the former to communicate to his counsel information necessary for professional representation; and in general—and for obvious reasons—doubts must be resolved in favor of the inclusion of a doubtful communication within its folds. A lawyer is duty-bound not to divulge a client's confidences to the disadvantage of the latter. Canon 37, Canons of Professional Ethics of the American Bar Association. Although this proscription is applicable to representation in both civil and criminal matters, its place is particularly sure in the latter field, where conceivably a disloyal or irresponsible act by a defense attorney may, in one way or another, operate firmly to close the door of

the penitentiary on his client, or even to forfeit his life.

5 USCMA at 612–13, 18 CMR at 236–37.

The present case does not involve a breach of the attorney-client privilege but rather it is a case where the attorney acted in her client's best interests to ensure that he surrendered and did not harm himself or others. No one at trial considered appellant deserted by his defense counsel or argued government interference with the relationship between appellant and his counsel. This might be a different case if the Government had attempted to introduce any conversations between appellant and Capt Battle. There is no evidence that Capt Battle turned over her notes to the Government to be used in obtaining a plea or acted disloyally or irresponsibly concerning appellant's interests.

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

Chief Judge COX, Judge SULLIVAN, and Senior Judge EVERETT concur.

GIERKE, Judge (dissenting):

I cannot join in condoning the Government's behavior. The majority apparently is not offended by Captain Battle's uncontradicted admission that she, acting on orders of her superiors, falsely assured Sergeant Godshalk that their "conversations were confidential and that [she] would represent him," when in fact she was acting as a government agent. In my view, this kind of outrageous conduct violates due process. If it is condoned, Air Force servicemembers will be justifiably wary of confiding in Air Force defense counsel.

The majority analyzes this case in terms of disclosure of privileged information. That analysis is off the mark because Capt Battle was not Sgt Godshalk's lawyer. She was a government agent pretending to be his lawyer. The majority places great weight on the Government's good intentions. This case is not about good intentions, but about the means used to carry out those intentions. The majority asserts that Sgt Godshalk waived any objections arising from Capt Battle's behavior. My reading of the record is that his purported waiver extended only to evidentiary objections.

The majority states that appellant has produced no evidence that he was prejudiced by the Government's subterfuge. The majority has it backwards. Instead, this case should be treated like the cases involving use of immunized testimony. I would require the Government, not Sgt Godshalk, to produce clear and convincing evidence that the law enforcement investigation, decision to prosecute, government trial tactics, appellant's election to retain civilian counsel, and appellant's decision to plead guilty were untainted by the subterfuge. See Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); Cunningham v. Gilevich, 36 MJ 94 (CMA 1992); United States v. Boyd, 27 MJ 82 (CMA 1988).

Without a remand for a full Kastigar-type hearing, the taint attached to this prosecution and the damage to the integrity of the Air Force's defense counsel structure cannot be purged. I cannot join in affirming Sgt Godshalk's conviction based on the record before us. Accordingly, I dissent.