UNITED STATES, Appellee

v.

PAUL W. HUTCHINS, Master Sergeant, U. S. Army, Appellant

6 USCMA 17, 19 CMR 143

No. 6078

Decided June 3, 1955

Lt Col Joseph L. Chalk, U. S. Army, and Capt Frank C. Stetson, U. S. Army, for Appellant.

LT COL Andrew D. Kane, U. S. Army, LT COL Thomas J. Newton, U. S. Army, and 1ST LT Benjamin C. Flannagan, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

Findings of guilty followed the accused's trial by a general court-martial under a charge and specification alleging that he had stolen $900.00 from the Central Noncommissioned Officers' Mess, Fort Benning, Georgia—in violation of the Uniform Code of Military Justice, Article 121, 50 USC § 715. These findings—and the sentence to dishonorable discharge, total forfeitures, and three and a half years' confinement at hard labor—were approved by the convening authority, who suspended the execution of the punitive discharge. Later a board of review in the office of The Judge Advocate General, United States Army, affirmed. Our grant of review has to do with the propriety of certain cross-examination of the accused soldier.

II

From August 1953 until February 19, 1954, Hutchins served as secretary of the Central Noncommissioned Officers' Mess at Fort Benning. On February 18 he withdrew from two of the clubs within his supervisory jurisdiction the sum of $850.00 for the stated purpose of reducing their petty cash funds. At that time an audit was in prospect, and the accused testified that he feared criticism if the several organizations under his supervision were found to possess excessive amounts of unbanked currency. In accordance with his custom, he was also in possession of $50.00 which belonged to the "change fund" of the Central Mess. Instead of transferring this money to the safe located in the main office of the Central Mess, the accused retained it upon his person. On the evening of February 18, he departed from Fort Benning for a nearby night club—for the assigned purpose of selecting and employing a dance band to perform at one of the clubs under his management. When he returned to his home from the cabaret, he did not possess the $900.00 he had taken there.

Although he claimed that the money had been either lost or stolen, Hutchins conceded that he had not immediately reported the loss to the Criminal Investigation Division, or other military authorities—and said that he had not done so because he feared that the incident would harm his reputation for responsibility. In an attempt to salvage the situation, he had—he said—sought loans from friends with which he might replace the missing funds, but without success. Matters were brought swiftly to a head through the agency of a semiannual audit, performed on February 19, during which the shortage was discovered.

In seeking to destroy the credibility of the accused's account of the loss of the money, trial counsel launched into extensive cross-examination with respect to personal checks of his which had been dishonored during his tenure as secretary of the Mess. While Hutchins did not recall the number of his checks which had been rejected by the drawee bank during this period, he conceded that "on many occasions" he had drawn checks when he knew that his bank account did not contain funds for their payment. He explained that, "On several occasions there comes a time when you meet friends in the club and want to be sociable, and as a consequence, I would write a check with the intention of catching it at the Central Office and sometimes I would miss it." Hutchins also admitted that in November and December of 1953 he "might" have drawn several checks against an account which had been closed out in October of that year—and he recalled having made good at various times a number of checks which had been returned for want of sufficient funds. His individual defense counsel objected strenuously to this line of questioning, but the law officer admitted the testimony as bearing on credibility.

III

Government appellate counsel have urged on several grounds that this cross-examination was proper. As one such

18

reason, they contend that it was justified by Hutchins' testimony on direct examination that "I have never stole." Cf. Walder v. United States, 347 US 62, 98 L ed 503, 74 S Ct 354; United States v. DeLeo, 5 USCMA 148, 17 CMR 148. It is also argued that the evidence with respect to dishonored checks served to reveal the motive of the accused to steal —that is, a desire to correct his bad financial situation—and thus was relevant for a purpose other than to show a criminal disposition. Cf. United States v. Haimson, 5 USCMA 208, 17 CMR 208.

It is unnecessary to consider these suggestions in detail—for the reason that we are convinced that the law officer did not err in permitting this cross-examination for the general purpose of impeaching the accused's trustworthiness as a witness. "Every departure from the norm of human behavior may not be shown on the pretext that it affects credibility." United States v. Long, 2 USCMA 60, 6 CMR 60. However, we have made clear that military law permits cross-examination calculated to bring out acts of misconduct on the part of a witness, although these have not resulted in conviction. United States v. Berthiaume, 5 USCMA 669, 18 CMR 293. The test is simply one of whether the act of misconduct is a "matter touching upon his [the witness'] worthiness of belief." Manual for Courts-Martial, United States, 1951, paragraph 149$b$(1). To a considerable extent, of course, the administration of the matter must be left to the sound discretion of the law officer, and this Court will usually intervene only when it believes that it would be unreasonable to conclude that the act of misconduct in question would serve to affect credibility. Cf. United States v. Hagelberger, 3 USCMA 259, 12 CMR 15 (reviewability of trial court's determination of witness' expertise).

The offense of "fraudulently making and uttering bad checks" has been deemed to involve moral turpitude by some authorities. See Manual for Courts-Martial, U. S. Army, 1949, para-

graph 118. The making and uttering of a worthless check with intent to deceive is punishable by the imposition of a dishonorable discharge—and therefore is assimilable to a felony. United States v. Moore, 5 USCMA 687, 18 CMR 311; United States v. Marrelli, 4 USCMA 276, 15 CMR 276. Accordingly, the misconduct of the accused here in drawing checks in amounts he could not cover, and against a bank in which he no longer maintained an account, can scarcely be regarded as venial. It distinctly involved misrepresentation by him—albeit an implied one—and this hardly speaks well for his credibility.

Since he received cash in return for the worthless checks he gave the Mess, he would seem to have been guilty of obtaining money by false pretenses. And if, as seems clear, he expended the money thus secured, or some part thereof, the offense would doubtless amount to larceny under the Code. United States v. Krawczyk, 4 USCMA 255, 15 CMR 255. Regardless of false pretenses, the conduct reflects a misappropriation of money entrusted to him as secretary of the Mess—for it is clear that he was without authority to use such funds to serve his own ends. Cashing his own worthless checks from funds of which he was in charge can only be deemed a personal project. Here again the offense would appear to be larceny—and no mere wrongful appropriation—certainly if the improperly obtained money be expended. United States v. Krawczyk, supra. Larceny is indisputably an offense involving moral turpitude. Manual for Courts-Martial, United States, 1951, paragraph 128$b$. And a conviction of larceny unquestionably may be used to impeach credibility. Manual, supra, paragraph 153$b$(2)($b$). Moreover, under our interpretation of paragraph 149$b$(1), supra, cross-examination concerning an act of larceny —regardless of judicial conviction thereof—is clearly available for an impeachment purpose. United States v. Berthiaume, supra.

IV

Accordingly, we cannot say that the law officer acted unreasonably, and abused his discretion, in holding that

**19**

this cross-examination of the accused constituted a proper method for the impeachment of his credibility as a witness. The decision of the board of review, therefore, must be and is affirmed.

Judge LATIMER concurs.

QUINN, Chief Judge (concurring in the result):

I concur in the result.

See my dissenting opinion in Krull, 3 USCMA 129, 11 CMR 129.