UNITED STATES, Appellee

v

JOHN C. McCLUSKEY, Sergeant First Class, U. S. Army, Appellant

6 USCMA 545, 20 CMR 261

547

No. 6694

Decided December 16, 1955

*First Lieutenant Bert M. Gross* argued the cause for Appellant, Accused. With him on the brief was *Major Edwin Doran.*

*First Lieutenant Lewis W. Evans* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Thomas J. Newton.*

## Opinion of the Court

PAUL W. BROSMAN, Judge:

Despite his plea of not guilty, a general court-martial convened at Headquarters, Ryukyus Command, convicted the accused, McCluskey, of the following offenses: making a false official statement, both an aggravated and a simple assault, making an additional false statement for the purpose of obtaining payment of a claim, and bigamy—in violation respectively of Articles 107, 128, 132, and 134, Uniform Code of Military Justice, 50 USC §§ 701, 722, 726, and 728. While the convening authority disapproved the findings under the Article 107 charge, the remaining findings and the original sentence—to dishonorable discharge, forfeiture of

all pay and allowances, and confinement at hard labor for ten years—were unaltered. A board of review in the office of The Judge Advocate General, United States Army, affirmed the modified findings and the sentence without opinion. We granted McCluskey's petition for review for the purpose of determining (1) whether certain Government exhibits were introduced in evidence in violation of the attorney-client privilege, and (2) whether an instruction by the law officer with respect to the defense of mistake of fact was prejudicial.

## II

The initial assignment of error requires that we consider once more certain aspects of the confidential relationship existing between a military lawyer and his client. In the latter part of May 1954, the accused was living in military housing with one Joan A. Gdovic McCluskey and the two children of their ostensible marriage. Question arose concerning the legality of this union—and the resultant issue of the eligibility of the accused's dependents to continue their occupancy of Government quarters became the subject of a conference between McCluskey and his battalion adjutant. Once it appeared that the offense of bigamy might possibly have been committed, the two conferees consulted with an officer of The Judge Advocate General's Corps—whom we shall term X—who was then serving within the command as an assistant staff judge advocate and legal assistance officer. During the meeting which followed, the adjutant took occasion to absent himself for a time, and the discussion of McCluskey's domestic problems and status continued privately.

Following this consultation, the latter returned with the adjutant to battalion headquarters and—after having been warned in accordance with the requirements of Article 31, 50 USC § 602—executed a statement in which he admitted that he had been previously married to a woman named Barbara A. McDade, but also asserted that he believed himself to have been divorced from her October 1952. This statement —introduced as a Government exhibit at the trial—reflected the places and approximate dates of the initial marriage and divorce, as well as those of the subsequent participation in a marriage ceremony with Joan A. Gdovic. This last event also took place during October 1952. Sometime during the month of August 1954, some three months after the original meeting, McCluskey again consulted with X regarding legal aspects of his domestic problem—this time entirely in private.

By Special Orders dated August 2, 1954, X had been appointed trial counsel of the court-martial to which the present charges against this accused were later referred for trial. In preparing for the hearing on these charges, X— together with a Major Y—drafted a message requesting that depositions be taken from relatives of Barbara A. McDade McCluskey for use in establishing at the trial that the latter had been alive on the date of the accused's purported marriage to Joan A. Gdovic. This message was signed and released by the staff judge advocate of the command concerned. Lieutenant X also addressed additional correspondence to certain officials in the locality of Barbara A. McDade McCluskey's last known address regarding other aspects of the original marriage—communications which he signed personally as trial counsel. Shortly thereafter, X was relieved of his duty as trial counsel of the court-martial in question, and he did not prosecute the accused when the case came on for trial.

Pursuant to the message request drafted by X and Y, deposition testimony was obtained from both of Barbara's parents establishing that she was indeed living at the time of the accused's purported marriage to Joan A. Gdovic. When these depositions were offered in evidence as Government exhibits at the court-martial hearing, the accused's lawyer objected strenuously and at length to their admission on the ground that they were tainted by a breach of the attorney-client relationship, which had previously existed between the accused and Lieutenant X. After this objection had been raised, X was called as a witness, and testified that he had advised McCluskey concerning his marital complications and re-

**549**

lated matters at their first meeting, and that during their second and final conference the same general problem had once more been discussed privately between them. X stated that he was of the opinion that he was acting as the accused's attorney at this second meeting. The law officer then overruled the objection of defense counsel, reasoning that, while he did *"not question that . . . [X] may have been bound by an attorney-client privilege,"* the latter had been engaged in no more than the performance of an administrative task when he assisted Major Y in drafting the message in question—conduct insufficient to place him in the position of having acted in any degree as a Government lawyer in the case. When the prosecution later sought to introduce certain communications received as a result of Lieutenant X's letters to state officials—and signed by him as trial counsel—a defense objection to their admissibility on similar grounds was sustained.

### III

It may be accepted as settled law in this Court that, since a lawyer is bound by professional duty to ▮▮▮▮ avoid divulgence of a client's confidences to the disadvantage of the latter, doubts concerning equivocal or apparently inconsistent conduct on the part of the attorney must be resolved against him—that is, it must be regarded as having been antagonistic to the best interests of his client. See In re Boone, 83 Fed 944, 952 (ND Cal). This rule stands as a rigid—perhaps even a dogmatic—one. We are sure that it exists of necessity, not only for the purpose of circumventing the dishonest practioner's malfeasance, but also to prevent the upright lawyer from placing himself in such a position as to require him to choose between conflicting duties. People v Gerold, 265 Ill 448, 107 NE 165, 177, and authorities there cited. Thus, regardless of the purity of his motives, it is demanded that the lawyer avoid the very *appearance* of that wrongdoing which, in obedience to the important policy dictating this privileged relationship, the courts are impelled to deplore —for "no rule in the ethics of the legal

profession is better established nor more rigorously enforced than this one." In re Boone, supra.

As we had occasion to say in United States v Marrelli, 4 USCMA 276, 15 CMR 276, "This privilege—one of the oldest and soundest known to the common law—exists for the purpose of providing a client with assurances that he may disclose all relevant facts to his attorney safe from fear that his confidences will return to haunt him." The recognition of this privilege in military case-law constitutes no juristic sport— for the following is provided by Article 27 (*a*) of the Uniform Code of Military Justice, 50 USC § 591:

". . . No person who has acted for the prosecution shall act subsequently in the same case for the defense, nor shall any person who has acted for the defense act subsequently in the same case for the prosecution."

And this mandate is implemented by the provisions of subparagraph 151*b*(2) of the Manual for Courts-Martial, United States, 1951, which provides, in pertinent part that:

". . . Military or civilian counsel detailed, assigned, or otherwise engaged to defend or represent an accused before a court-martial or upon review of its proceedings, or during the course of an investigation of a charge, are attorneys and the accused is a client, with respect to the client and attorney privilege."

In obedience to these injunctions, and in a commendable effort to elevate the standards of professional service afforded military personnel, the Armed Forces have implemented the basic Code and Manual directives by the adoption of internal regulations. Of immediate interest in this connection is Army Regulation 600-103, entitled "Legal Assistance"—subparagraph 10*a* of which provides that, inasmuch as the services contemplated by the legal assistance program are essentially professional, "the usual attorney and client relationship must be maintained by all concerned. Consequently, all such service and the files pertaining to the persons

served will be treated and considered as *confidential and privileged,* in the *legal rather than in the military sense. Such privileged matters will not be disclosed to anyone by military personnel rendering the service,* except upon the specific permission of the person concerned, *and disclosures thereof may not lawfully be ordered by superior military authority.*" (Emphasis supplied.) Obviously, then, if an examination of the present circumstances brings us to the conclusion that an attorney-client relationship existed between Lieutenant X and this appellant, all of the former's activities in the premises not concerned with the maintenance of that relation must be measured jealously, and with the highest degree of care.

Did Lieutenant X act as an attorney for this accused person within the meaning of the privilege? ▪ Dean Wigmore, in his distinguished treatise on the law of evidence, sets down the following prerequisites:

"(1) *Where legal advice of any kind is sought* (2) *from a professional legal adviser in his capacity as such,* (3) *the communications relating to that purpose,* (4) *made in confidence* (5) *by the client,* (6) *are at his instance permanently protected* (7) *from disclosure by himself or by the legal adviser,* (8) *except the protection be waived.*" [Wigmore, Evidence, 3d ed, § 2292.]

It must be evident without further demonstration that an attorney-client relationship was indeed present here. This appellant—although accompanied by his battalion adjutant for a time during the first of two consultations—sought legal information and direction from Lieutenant X, who, in his capacity as legal assistance officer, must be held to have been acting as a professional legal adviser.[1] All statements made at this time must be presumed to have been directed toward the purpose of securing legal guidance. Indeed, X testified that

the discussions had directly to do with the appellant's tangled domestic affairs and the papers the latter would require for the purpose of substantiating his position with respect to his dependency allowance. Moreover it cannot be denied that the conversations which occurred during the second conference—an entirely private one between X and the accused—were confidential in every respect.

Whether communications made in the presence of the adjutant during the first consultation were ▪ made in confidence gives us a certain amount of pause—this for the reason that the overwhelming weight of authority is to the effect that no privilege can be deemed to arise where a third party—the agent of neither attorney nor client—is present. Wigmore, supra, § 2311. However, the present record is barren of information as to which facts, if any—material to the issue and possibly damaging to the appellant's interests—were developed during the tripartite portion of the discussions with X, and which during the other. Particularly are we left at sea by the absence of testimony from the adjutant, who—under the provisions of general law, as well as those of paragraph 151*b* of the Manual—would have been permitted to testify to statements made in his presence by the accused to Lieutenant X, regardless of limitations on the latter. We are thus left wholly to speculation in determining the extent to which these revelations—if any, in fact, were made in the adjutant's presence—are to be considered confidential. In such a situation we must—in light of our decision in United States v Green, 5 USCMA 610, 18 CMR 234—resolve doubts "in favor of the inclusion of a doubtful communication within [the privilege's] folds." In according this accused the benefit of such doubts, we are therefore required to conclude that all statements material to the issues at hand were made in a general aura—

---

[1] It is to be noted, however, that paragraph 10*b*, Army Reg- ▪ ulations 600-103, *supra,* prohibits the giving of advice where the subject matter is, or will be, the subject of a court-martial action. Suffice it to say that if, by operation of law, an attorney-client relationship was, in truth, formulated, such Regulations cannot operate to nullify it.

a climate—of professional confidence. All other requisites for the formation of an attorney-client relationship clearly having been satisfied, it follows that such an association between Lieutenant X and the appellant before us was in full force and effect at the time X began his preparations for the latter's prosecution.

## IV

In determining whether these subsequent activities of Lieutenant X violated the obligations assumed earlier by him, a careful examination of our opinion in United States v Green, supra, is necessary. In that case, a military lawyer, after representing the accused, Green, during an Article 32 investigation, complied with an order of his immediate superior—the staff judge advocate of the command exercising special court-martial jurisdiction over Green— to submit to the latter a resumé of expected Government evidence for use in the forthcoming trial by general court-martial. This memorandum was referred ultimately to the appropriate trial counsel for his edification and guidance. In answer to Green's claim or prejudicial error arising from this pretrial impropriety, the Government contended that the activities of the attorney involved were not professional in nature—inasmuch as, in digesting material otherwise readily available, he performed what was essentially a ministerial task. In other words, that which he did in behalf of the prosecution he did not do as a *lawyer*, and thus he was placed beyond the pale of the privilege's prohibitions. We were unable to accede to this argument, but reasoned instead that the attorney in question—after defending the accused carefully and competently during the pretrial proceedings—prepared what amounted to a professional document, and that he must have been aided in this project by a familiarity with the evidence gained while serving as Green's lawyer. Accordingly, we found in the challenged document both a measure of aid to the trial counsel—although possibly slight and indirect— and resultantly a fair risk that the attorney had assisted in the prosecution

552

of his erstwhile client. In consideration of the overwhelming importance of the relationship involved, this deviation— this appearance of wrongdoing— was held sufficient to prejudice the rights of the accused inherently and generally.

In the case at bar, we are met by a similar Government claim—that is, that the present attorney was performing a merely mechanical, or at most an administrative, chore when he assisted in the procurement of the deposition testimony under objection. As applied to the facts before us, we must say that we consider this contention to be without merit. Here, the attorney, as a result of professional consultations, must necessarily have acquired from the accused information concerning one or more of the offenses charged against him in the present case. It is clear to us that he was thereby rendered ineligible for service as a member of the Government's legal staff, and every attempt should have been made to isolate him from the ensuing trial. Instead, he was permitted to stand in the position of trial counsel —the officer selected to prosecute the accused for the very offense with which the professional consultation dealt—and proceeded to utilize the confidences tendered him in a successful effort to obtain evidence of sufficient weight successfully to prosecute his former client. The measure of aid thus afforded the prosecution was certainly more than "indirect" or "possibly slight." Instead, it resulted in the procurement of testimony on which rested the sole proof of one of the elements of the offense of bigamy. Thus X transformed the risk that he had assisted in the prosecution of this appellant into a certainty. The fact that Lieutenant X was subsequently relieved as trial counsel, and did not represent the Government at the trial, we regard as immaterial. Indeed, our conclusion would have been no different had the attorney accomplished much less for the Government than he did in fact.

## V

From what has been said it must be manifest that reversal in some measure

is required. However, it remains to assess the *extent* of prejudice ▆▆▆▆▆▆▆▆ to this appellant's rights.

In United States v Green, supra, it was noted that the assistance of the attorney involved had extended to *all* of the charges of which the accused stood convicted. In view of the pervasive character of the breach found there, we were required to conclude that every aspect of the trial had been tainted—hopelessly and irretrievably. Moreover, the vague circumstances surrounding the lawyer's impropriety in Green's Case made *particularized* injury to the latter's rights difficult of ascertainment. Because of the signal importance of the values with which we were dealing, and because no showing of specific prejudice could be made with assurance, our reversal there was based on the concept of general prejudice, and a rehearing of the entire cause was necessitated.

It is never necessary, however, to inquire into the desirability of a reliance on the notion of general prejudice where there is a "finding of a probability of specific prejudice against the accused." United States v Bound, 1 USCMA 224, 230, 2 CMR 130, 136. In the case at bar, therefore, a different result may well obtain. The specific and particularized injury to this appellant's substantial rights is patent. The deposition testimony of Barbara's parents—as it was utilized at the trial—was essential to the establishment of one of the prime elements of the crime of bigamy: a finding that the lawful wife of the accused was living at the time of his marriage to Joan. Furthermore, the falsehood alleged under the instant charge of a violation of Article 132 was contained in a letter prepared and forwarded by the appellant requesting of appropriate officials a substitution of the name of "Joan A." for "Barbara A." McCluskey on his dependency allotment authorization. It will be understood that this request was made on the theory that the name of his allotment beneficiary had been recorded incorrectly through oversight on the part of the Army. The reception of the challenged deposition undoubtedly aided in bringing home to the court the essential connection between the two offenses—that is, the bigamy and the false statement—and thus furthered the Government's efforts in its successful prosecution of the latter charge as well. Certainly, then, Lieutenant X's activities in this particular must be held to have resulted in benefit to the Government which was both direct and abundant.

Moreover, the confidential communications made to Lieutenant X concerned the appellant's domestic affairs alone—that is, his marital status and related matters, including the necessity for substantiation of his dependency allowance claims. There is no shred of evidence in the record—and, indeed, no slightest basis for supposition—which suggests the existence of any sort of privileged contact between X and McCluskey which had to do with any phase of the two allegations of assault, which were before the court-martial in this case. Thus it seems reasonable to channel the prejudice flowing from Lieutenant X's prosecution activities against only those charges lodged against the accused under Article 132 and 134 of the Code—that is, the making of a false statement for the purpose of obtaining payment of a claim, and the crime of bigamy. Therefore, we experience no difficulty in finding that the professional impropriety manifested by Lieutenant X in this case specifically and materially prejudiced the substantial rights of the present appellant—but that this prejudice did not attach to the two charges of assault of which he was found guilty.

## VI

Although our conclusion respecting the initial assignment of error will control the ultimate disposition of this appeal, the second is of sufficient moment to warrant a limited treatment at this time for the guidance of military courts.

It will be recalled that—following the first of the two conferences with Lieutenant X—the appellant dictated a statement to his battalion adjutant in which he admitted having been married at one time to a Barbara A. McDade, but asserted that he believed himself to have

**553**

been divorced from her prior to his marriage to Joan A. Gdovic. This statement—which contained as well fragmentary facts concerning the procurement of the divorce—was introduced as a prosecution exhibit over vigorous defense objection. Prior to the court's retirement for deliberation on findings, the law officer supplied the following instruction having to do with mistake of fact:

". . . There is evidence . . . tending to show that at the time of his alleged bigamous marriage to Joan Gdovic the accused believed that he was no longer married to Barbara McDade. *You are advised that a person who at the time of his allegedly bigamous marriage had an honest and reasonable belief that his prior marriage had ceased to exist cannot be found guilty of bigamy, even though he may be mistaken in that belief.* The belief must not only have been honest, but it must also have been reasonable. A person's belief, therefore, must have been based on information which would indicate to a reasonable man that his prior marriage had ceased to exist. Further, a person must have made such a diligent inquiry, if any, as a reasonable man under the same circumstances would have made to ascertain the truth of the matter upon which the belief was based." [Emphasis supplied.]

Appellate defense counsel now call to our attention certain previous decisions of this Court in which ▆▆▆▆▆ ▮ it was held that instructions relating to the defense of mistake or ignorance of fact—instructions which required that the ignorance or mistake be both honest *and* reasonable—were erroneous. It is now contended that we are required to apply the rationale of those holdings to the mistake of fact charge furnished here with respect to the crime of bigamy.

We are sure, however, that these cases are readily distinguishable. Our decisions to the effect that the defense of mistake of fact must be put in terms of honesty alone have concerned—not·· entirely, but for the most part—situa-·

tions which involved a crime requiring a specific criminal intent. See United States v Rowan, 4 USCMA 430, 16 CMR 4; United States v Taylor, 5 USCMA 775, 19 CMR 71. Certainly we have not meant to hold that the defense of *mistake* of fact—with its limitation to honesty alone—need necessarily be applied with equal vigor where the offense involved demands merely a general "criminal mind." Moreover, although we have held that an honest *ignorance* of fact, however unreasonable, constitutes a complete defense to a charge of wrongful possession or use of narcotic drugs—crimes requiring no specific intent—the reasons advanced in support of that conclusion do not demand that we reach the same result here. See United States v Greenwood, 6 USCMA 209, 19 CMR 335; United States v Lampkins, 4 USCMA 31, 15 CMR 31. While it has been argued that the cases mentioned last above are indistinguishable from the present situation, we have no doubt that a perceptible line of demarcation exists.

In a crime involving specific intent, it may readily be seen that either a mistake or an ignorance of an essential fact may serve to negate the possibility of the existence of that element. Thus, so long as the mistake is an honest one, this result is accomplished—regardless of whether a reasonably prudent man would, under like facts and circumstances, also have been mistaken. Too, in the instance of an offense such as the use or possession of a habit-forming drug, the assertion of an honest *ignorance* of the alleged possession or use serves to eliminate that conscious wrongful purpose prerequisite to the commission of this variety of general intent offense. But where, as in the present situation, the accused asserts that, while he possessed knowledge of the facts giving rise to the prosecution, he believed one or more of them to be different in a material particular than was actually the case, neither of the results mentioned above would obtain—and a different standard may appropriately be applied. The result of this basic dis-

tinction was pointed out by us in the Lampkins case, supra, as follows:

"It should be apparent . . . that a mistake based on negligence presents a somewhat different problem than does ignorance based on negligence. We can assume, arguendo, that if a person has knowledge that he possesses an article which may or may not be contraband, he has some duty to determine its characteristics, and, that if he reasonably fails to do so he can be convicted for having it in his possession. The same rationale cannot be applied if he is honestly, albeit negligently, ignorant of its presence."

Dealing specifically with the offense of bigamy, we find that our conclusion is supported fully by a review of the civilian and existing military decisions. Indeed, a majority of American states appear inclined flatly to disallow the defense of mistake as to this crime—be it both honest and reasonable. See Russell v State, 66 Ark 185, 49 SW 821; State v Hendrickson, 67 Utah 15, 245 Pac 375; Rogers v Commonwealth, 24 Ky Law Rep 119, 68 SW 14; Ellison v State, 100 Fla 736, 129 So 887; Commonwealth v Hayden, 163 Mass 453, 40 NE 846. However, a minority of the States and the decision of one Federal court have adopted the position that an honest mistake—if reasonable—will serve as exculpation. See Robinson v State, 6 Ga App 696, 65 SE 792; Leseuer v State, 176 Ind 448, 95 NE 239; Baker v State, 86 Neb 775, 126 NW 300; Alexander v United States, 136 F2d 783 (CA DC Cir), and cases cited. This latter rule appears to have been followed by Service boards of review. United States v Avery [ACM 6161], 9 CMR 648; and United States v Duff [ACM 7165], 12 CMR 802, 807.

Although in some of its previous decisions in this area this Court has, in effect, amended the provisions of paragraph 154a(3) of the Manual by holding that their coupling of *reasonableness* to the defense of mistake or ignorance of fact operated to place an indefensible burden on an accused person, we are not constrained to so do in the instance of the crime of bigamy. Therefore, this petitioner—while admitting his previous marriage, but asserting a mistaken belief in the existence and validity of a subsequent divorce—must be held not only to have acted honestly, but also to have taken such steps as would have been taken by a reasonable man, under the circumstances, to determine the validity of that honest belief. That is, he should have done so before relying thereon in such a serious setting as the present one. The instruction supplied the court-martial by the law officer here did no more than place this rule before its members—and as such was without error.

In the Greenwood case, supra, we said that, "Unless required by statute or ancient custom, we simply hesitate to bottom criminal responsibility as a matter of law on a mere negligent omission." There we were unable to find either statutory or customary warrant for holding that one might become guilty of a narcotics offense by reason of simple negligence. However, such a basis for penal liability is not wholly unknown to military law, and has been recognized by this Court, in the instances of negligent homicide (based on long-standing usage) and negligent loss, damage or destruction of Government property (based on statute.) United States v Kirchner, 1 USCMA 477, 4 CMR 69; Article 108, Uniform Code of Military Justice, 50 USC § 702; see United States v Ryan, 3 USCMA 735, 14 CMR 153. Here we are sure that the ancient practice of both civilian and military courts with respect to the defense of mistake of fact in the crime of bigamy justified the conclusion we have reached.

## VII

In light of the views expressed in preceding sections of this opinion, only those parts of the findings relating to the two charges of assault are affirmed. The record of trial is returned to The Judge Advocate General, United States Army, for transmittal to a board of review for reconsideration of sentence, or, in the alternative, for a rehearing

on the charges laid under Articles 132 and 134.

Chief Judge QUINN and Judge LATIMER concur.