UNITED STATES, Appellee

v

EDWARD V. TURLEY, JR., Captain, U. S. Army, Appellant

8 USCMA 262, 24 CMR 72

*First Lieutenant Gene E. Overbeck* argued the cause for Appellant, Accused. With him on the brief were *E. F. Gunter, Esq.*, and *Major Frank C. Stetson.*

*Lieutenant Colonel Thomas J. Newton* and *Captain Thomas J. Nichols* were on the brief for United States, Appellee.

## Opinion of the Court

HOMER FERGUSON, Judge:

The accused officer is under sentence to dismissal following conviction of the offenses of larceny, wrongfully and dishonorably borrowing money from an enlisted man, and uttering a check with intent to deceive. He petitioned this Court for grant of review to test the correctness of the board of review's decision affirming the findings and sentence. For reasons hereafter stated, we conclude that the conviction must be reversed because of trial counsel's unauthorized divulgence of confidences previously derived from the accused, which operated to the latter's prejudice.

In April and May of 1956, the accused, as commanding officer, received sums of money from an enlisted man under his command for deposit in a soldier's deposit account. These sums were never deposited as required by regulations. In July of the same year, the accused borrowed a substantial sum of money from the same enlisted man, offering in return a post-dated check, which was subsequently dishonored upon presentment. This series of transactions constituted the bulk of the charges upon which the accused was convicted.[1]

Testifying in his own behalf, the accused readily admitted receiving the sums for deposit to the enlisted man's account. He testified that he had put the money in envelopes which were then

[1] The accused was also convicted of an additional charge of larceny of a sum of money from the NCO Mess.

placed in a locked safe. Because there were "numerous things" on his mind, and due to the fact that he was "extremely over-worked; working hard, trying to get ready" for his departure from Fort Bragg on a unit exercise, he failed to make the deposits. The exercise required that he report to Norfolk, Virginia, and prior to his departure he opened the safe, removed the contents and placed them in a map case which he took with him. He had intended to forward these deposits together with certain other paper work while he was away. Due to the vigorous training he underwent at Norfolk, he was "pretty well beat" and unable to attend to any administrative paper work in the evenings. He placed the envelopes containing the money, together with other papers, inside a waterproof bag for shipment back to Fort Bragg to be stored under lock and key to await his return.

As a result of a tactical error, which occurred during the exercise, he was relieved from command of his unit and returned to Fort Bragg ahead of schedule. On the day following his return, he was assigned to another unit. He returned to his company to collect his personal possessions and found, to his dismay, that his desk had been cleared of his personal papers, books and manuals, and stacked on two shelves in the orderly room. He became "extremely irritated" in finding his possessions in this manner and with his mind "in the state it was in" he took the waterproof

bag—which he had sent back from Virginia—and dumped its contents on the floor. A few items were removed from this pile but the rest of the papers and materials were dumped into a wastepaper basket. Upon subsequently realizing that the envelopes containing the funds had been among the contents deposited in the wastepaper basket, he "searched and searched" but the envelopes were never found.

In an effort to rebut the accused's testimony and to destroy the credibility of his account of the loss of the money, the trial counsel entered upon a vigorous cross-examination concerning various aspects of his finances and his method of handling them. The accused acknowledged that his previous duties had included that of finance officer and that he had been taught the proper method of handling entrusted funds. The cross-examination then touched upon the accused's pay status and during this interrogation, the following colloquy occurred between trial counsel and the accused:

"Q: Captain Turley, in handling your finances, have you ever had to repay the Government any other money?

"A: $163 dollars and some odd cents for travel of dependents from here to the west coast.

"Q: Any other?

"A: $1560.

"Q: What was that for?

"A: Loss of funds.

"Q: What funds?

"A: I was deputy disbursing officer in the Division where they were lost; a board was held. Initially the board came out—well, I don't know what the original hearings were, but I got back in May 1955; the day before the final board met, I went down and sat in on the board.

"Q: What were the funds?

"A: Soldiers' Deposits vouchers.

"Q: Ah! Soldiers' Deposits again?"

At the completion of cross-examination, defense counsel inquired of the accused concerning the manner in which this information had come to the trial counsel's, attention. The following testimony was then elicited from the accused:

"Q: When did trial counsel first have notice that this amount of money may have been missing from the Division Finance?

"A: I don't know what time he first got into it, but I came up to see him personally and told him I would like to let legal advice. It was in January or February, when the board proceedings came back.

"Q: You consulted him as an attorney in an attempt to get advice?

"A: Yes, Sir.

"Q: You consulted him in an attorney-client relationship?

"A: I believed so. He was a JAG officer. I told . . . [the trial counsel] the entire story.

"Q: Did you ask for advice?

"A: Yes, Sir.

"Q: Did he give you advice?

"A: Yes, Sir; professional advice.

"Q: Did you consider this information priviliged [sic], or confidential?

"A: Yes, Sir, because it would ruin my reputation if it got out. I just got stuck with it.

"Q: What did he advise you to do?

"A: There wasn't much I could do.

"Q: What did . . . [the trial counsel] advise you to do?

"A: To go ahead and pay it.

"Q: What would have happened if you had not paid it?

"A: I would have been tried for not paying a legitimate debt, and my car and everything else taken by the bonding company."

At the conclusion of the accused's testimony, trial counsel—at his own request—took the stand in order to clear up questions concerning the "attorney-client relationship." He testified that some six months prior to trial the accused had consulted him requesting advice relating to a board proceeding which had found the accused pecuniarily liable for half the loss of specific funds. Another officer, who was adjudged pecuniarily liable for the remainder of the loss, had "threatened blackmail if he [the accused] did not make full payment." Trial counsel further stated that he "advised him that he should not subject himself to blackmail, and to refuse to pay the full amount." After conducting an investi-

gation of the present charges, it "dawned" on him who the accused was. He did not consider the information he had obtained as a subject for cross-examination until after he had "delved into the case." He admitted, however, that the accused had come to him for advice and that he had given such advice although maintaining that "Anyone could have answered that question; any lawyer—any officer."

We note at the outset that trial counsel's good faith and moral integrity are in no way challenged in this proceeding. His error, however, lies in his failure to realize that an attorney-client relationship had been created. His assertion that anyone—lawyer or nonlawyer —would have given the same advice falls wide of the mark. The inescapable fact nevertheless exists that the accused sought an attorney's advice and trial counsel as a professionally competent attorney so advised him. Dean Wigmore, in his classic work on Evidence, sets forth the following prerequisites essential to the creation of such relationship:

"(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived." [Wigmore, Evidence, 3d ed, § 2292.]

When we apply these prerequisites to the instant case there can be little doubt that the relationship did, in fact, exist. The accused here had sought legal advice concerning the board proceeding which had held him pecuniarily liable for the loss of funds; the advice was sought from one who was an attorney and member of the Judge Advocate General's Corps; the communications between the two related to the accused's liability; and such communications were made in strictest confidence by the accused. From that point of time on those communications were permanently protected from disclosure by the legal adviser. There is no question in this case concerning a waiver of the protection.

Once the attorney-client relationship has been shown to exist, no court— either Federal or state—has been more zealous in safeguarding and strengthening the privilege arising therefrom than has this Court. We need not look to the decisions of other courts for precedent—our own cases speak for themselves. In United States v Fair, 2 USCMA 521, 10 CMR 19, we noted that the privilege was "designed to encourage full and unrestrained communication between client and attorney" and that any forced revelation of communication resulting from such relationship is "certain to discourage free and full disclosure of facts by the person seeking assistance of counsel." Later, in United States v Marrelli, 4 USCMA 276, 15 CMR 276, we said that the privilege exists "for the purpose of providing a client with assurances that he may disclose all relevant facts to his attorney safe from fear that his confidences will return to haunt him." In United States v Green, 5 USCMA 610, 18 CMR 234, we made it crystal clear that no longer "does military law tolerate disloyalty on the part of an accused's lawyer." An attorney, who has on a previous occasion represented or advised an accused person, "must avoid the slightest suspicion, the very appearance, of assisting—little or much, directly or indirectly, consciously or unconsciously— in the prosecution of his erstwhile client, from whom he may have acquired private information." In United States v McCluskey, 6 USCMA 545, 20 CMR 261, we said that since an attorney is bound to avoid divulgence of a client's confidences to the latter's disadvantage "doubts concerning equivocal or apparently inconsistent conduct on the part of the attorney must be resolved against him—that is, it must be regarded as having been antagonistic to the best interests of his client." Recently, in United States v Lovett, 7 USCMA 704, 23 CMR 168, we reversed a conviction where counsel had represented conflicting interests. We had no doubt concerning the "prejudicial nature" of such a relationship. Again,

in United States v Thornton, 8 USCMA 57, 23 CMR 281, we warned that the "orderly administration of justice requires that an attorney not be placed in a position where he must choose between conflicting interests." The wall separating the confidences an attorney has learned from his client, on the one hand, and their subsequent unauthorized divulgence by the former, on the other, must forever be kept high and impregnable.

The extent of the prejudice flowing from trial counsel's violation of the privilege cannot reasonably ▅▅▅▅▅▅ ■ be channeled to any particular offense as was possible in McCluskey, supra, but attaches instead to all offenses charged as in Green, supra. There is no question but that the prosecution's case was substantially strengthened by evidence concerning the accused's prior irregu-

larities in the handling of soldiers' deposit funds. United States v Boyd, 7 USCMA 380, 22 CMR 170. Interrogation along those lines was relevant and touched upon the accused's worthiness of belief. United States v Hutchins, 6 USCMA 17, 19 CMR 143. It served to effectively diminish his credibility and place him in a most unfavorable light in the eyes of the members of the court. United States v Berthiaume, 5 USCMA 669, 18 CMR 293; United States v Hubbard, 5 USCMA 525, 18 CMR 149. Accordingly, we have no hesitancy in concluding that trial counsel's violation of the attorney-client privilege substantially prejudiced the accused and his conviction cannot be allowed to stand.

The decision of the board of review is reversed and a rehearing is ordered.

Chief Judge QUINN and Judge LATIMER concur.